**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KIMBERLY ANNE F.,**

                                        **Plaintiff,**

         **v.**                                                              **8:19-cv-774**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

                                        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                                        **DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff Kimberly Anne F. ("Plaintiff") brings this action pursuant to the Social

Security Act, 42 U.S.C. § 405(g), for review of a final determination by the Commissioner of

Social Security ("Defendant" or "the Commissioner") denying her application for benefits.

Plaintiff alleges that the Administrative Law Judge's decision denying her application was

not supported by substantial evidence and was contrary to the applicable legal standards,

and asks that the Commissioner's decision be reversed and the matter remanded.  (Dkt.

No. 7).  The Commissioner opposes Plaintiff's arguments, and asks that the

Commissioner's decision be affirmed.  (Dkt. No. 10).

        Pursuant to Northern District of New York General Order No. 18, the Court proceeds

as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

1

After reviewing the Administrative Record,[1] (Dkt. No. 6), and considering the parties'

arguments, Plaintiff's motion for judgment on the pleadings is granted and Defendant's

motion is denied.  The Commissioner's decision is reversed and the matter is remanded for

further proceedings.

## II.   BACKGROUND

### a.  Procedural

On December 2, 2015, Plaintiff applied for Social Security benefits, alleging that she

had been disabled since May 9, 2015. (R 156-57).  After her application was initially denied

(R 91-95), Plaintiff requested an administrative hearing. (R 97).  At her February 15, 2018

hearing, Plaintiff asked Administrative Law Judge ("ALJ") Gretchen Mary Greisler to

consider only a closed period of disability, from May 9, 2015 through June 7, 2017, the date

she returned to work. (R 31, 215).  On May 22, 2018, the ALJ issued a decision denying

Plaintiff's claims. (R 12-22).  On April 25, 2019, the Appeals Council denied Plaintiff's

request for administrative review, making the ALJ's decision final and ripe for judicial review

under 42 U.S.C. § 405(g). (R 1-6).

### b.  Factual

#### 1.  Background Information & Plaintiff's Testimony

Plaintiff is a forty-seven year old woman who worked as a keyboard specialist in a

New York State correctional institution since 1994. (R 36-37, 176).  She left work due to

carpal tunnel syndrome (among other impairments) in 2011 (R 37-38), and received

disability insurance benefits for approximately one year before returning to work (R 72).

---

[1]The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 6), as "R" throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

2

She testified that when she returned to work, her new supervisor was "very hard to deal with" and "mentally abusive," and she became "nervous all the time" and had "panic attacks constantly" as a result. (R 39-41).  She asserted that because this new supervisor constantly berated her she was scared to drive to work, and once there was afraid to go into the building. (R 40-41).  Her symptoms included difficulty breathing, shaking uncontrollably, throwing up, constant panic attacks, and inability to sleep. (R 41).  She testified that she cried constantly and did not want to talk to or be around anyone, only felt safe in her bedroom, could not go to her kids' games, and could not  drive her kids or participate in their activities. (R 41).  She explained that her therapist suggested that she either see psychologist Dr. James E. Cerio or go for inpatient treatment, as she was having panic attacks a couple times a day. (R 41).  She stated that she had always loved her job and the place she worked.  She testified that Dr. Cerio diagnosed her as having post-traumatic stress disorder ("PTSD"), and explained that her problem was attributable to the fact that her supervisor was a male authority figure that brought back issues relating to her being molested and sexually assaulted as a child. (R 42).  Plaintiff stated that she had difficulty sleeping at night as her mind would be racing constantly, and then would sleep during the day. (R 45-46). She stated that she rarely left her bedroom as she claimed she felt better if she did not have to see anyone or do anything that would remind her of what she was not doing. (R 46).

Plaintiff  stopped working in May 2015 (R 175), then received sick pay for approximately one year until she was terminated in May 2016 (R 166, 213).  She was rehired at the same job in June 2017. (R 166).

## 2.  Vocational Expert's Testimony

3

Vocational expert Linda Vause testified as to the classification of Plaintiff's past work, and in response to hypotheticals.  It was her opinion, in response to a hypothetical involving limits to sedentary work, that there were jobs available in the national economy that Plaintiff could perform such as document preparer, addresser and surveillance system monitor. (R 50-51).  When the hypothetical was changed to light work, additional jobs such as photocopying machine operator, routing clerk and marker were added.  When the hypothetical was changed such that the individual should not work in conjunction with others, the jobs of document preparer, addresser and surveillance system monitor would still be available.  No jobs would be available in the national economy if the hypothetical was changed such that the individual could have contact with a supervisor less than 15% of the day. (R 54-55).  Ms. Vause also testified that no jobs would be available if the person was off-task 20% of the day. (R 55).

### 3.  Relevant Medical Evidence

Plaintiff received treatment for various mental and physical conditions during the approximately two-year period at issue in this case.  Her arguments here focus entirely on her mental impairments, (see generally Plaintiff's Brief ("Pl. Br."), Dkt. No. 7), and therefore the Court limits its review to that aspect of Plaintiff's claim.  The Court assumes familiarity with the medical evidence in this case, and will set forth only that evidence material to the Court's determination.

### A.  Kathy Green, PMHNP-BC

Plaintiff received mental health counseling on a regular basis from Kathy Green, PMHNP-BC ("NP Green"), between December 17, 2009 and December 9, 2016. (R

4

248-297, 394-398).  She was seen by NP Green on twenty-eight occasions during this time period.  (R 248-297, 394-398).  Historically, Plaintiff had been treating for depression and anxiety, but those conditions appeared to became more severe on May 9, 2015.  NP Green noted that Plaintiff's mood and affect were sad, crying and depressed. She presented with decreased energy/motivation, and her speech was slow and pressured. (R 261).  It was noted that Plaintiff had not been able to get out of bed that week; her heart was racing and she had an anxious feeling like she was going to throw up.  She also identified that she had trouble sleeping and a decreased appetite.  On June 10, 2015, Plaintiff's mood was tired; she had decreased energy/motivation which she described as fatigue.  She was getting only 4-5 hours of sleep a night and was feeling very tired with some nausea.  NP Green increased Plaintiff's prescription for Abilify and scheduled their next meetings to take place over Skype. (R 260).  Plaintiff met with NP Green on July 10, 2015 and August 6, 2015. (R 258, 259).  On both occasions Plaintiff's medications were Abilify, Zoloft, and Clonazepam.  On August 6, it was noted that Plaintiff was tearful with decreased energy/motivation.  Plaintiff stated that she felt down with low energy all the time, that she would feel like a loser if she did not go back to work, and that she used to like to work. (R 258).  On September 8, 2015 Plaintiff met again with NP Green over Skype.  It was noted that her mood was sad and insecure with increased self-doubt; she was tearful and crying with decreased energy/motivation.  She stated that she felt emotionally and physically tired; felt like she was a bad mom for taking prescription medications.  She stated that she missed work as she had loved her job.  NP Green's plan was to start Plaintiff on

the generic drug bupropion[2] while continuing her on Zoloft and Clonazepam.  (R 257).

Plaintiff met with NP Green again via Skype on November 7, 2015, at which that time her

mood was dysphonic; she admitted to increased social anxiety and becoming physically ill

when thinking about returning to work.  She stated that some days she does not leave the

house, and that recent events have made her feel like a "little girl" and crawling into a fetal

position. (R 256).  On February 27, 2016, Plaintiff appeared disheveled; she was tearful and

crying with depressed mood.  She described herself as a basket case, indicated that she

cries and feels guilty, and stated that she does not know what happened to her as she was

not able to deal with anything, was not able to attend her sons' sporting events, and could

not leave the house.  NP Green's plan included increasing bupropion while continuing

Plaintiff on Zoloft and Clonazepam, calling psychologist Dr. James E. Cerio to see if he

could see Plaintiff for therapy, and to counsel Plaintiff to consider a brief in-patient stay if

she was unable to get additional therapy. (R 394).  On July 17, 2016, NP Green noted that

Plaintiff looked disheveled with a depressed mood and was  tearful during her meeting. (R

395).  Plaintiff met with NP Green again via Skype on December 9, 2016, where she

expressed a little more optimism, but was scared about leaving the house. (R 397).

NP Green submitted a Medical Source Statement of Ability to do Work-Related

Activities (Mental) on July 5, 2016 wherein she opined that Plaintiff had "marked" limitations

in her abilities to: 1. Carry out complex instructions; 2. Make judgments on complex

work-related decisions; 3. Interact appropriately with the public; 4. Respond appropriately to

usual work situations and to changes in a routine work setting; and 5. Respond

---

[2]"Bupropion (Aplenzin, Wellbutrin, Wellbutrin SR, Wellbutrin XL) is used to treat depression."
https://medlineplus.gov/druginfo/meds/a695033.html (accessed 11/23/20).

appropriately to changes in a routine work setting.  (R 324-325).  She also found Plaintiff

had a "moderate-marked" limitation in her ability to understand and remember complex

instructions, and had "moderate" limitations in her abilities to: 1. understand and remember

simple instructions; 2. carry out simple instructions; and 3. making judgments on simple

work-related decisions.  NP Green indicated that Plaintiff  "suffers from major depression

and post traumatic stress which interferes with executive functioning in her brain (attention,

focus, concentration, memory)." (R 324).  She also indicated that Plaintiff "has significant

anxiety with panic attacks & currently avoids social settings, people, places.  She is not

coping well with any type of change in her routine & isolating at home."  (R 325).   NP Green

assessed that Plaintiff had "low self-esteem/worth 2°[3] work place harassment." (R 325).

NP Green completed a second Medical Source Statement of Ability to do

Work-Related Activities (Mental) on July 6, 2016[4] wherein she opined that Plaintiff had

"marked-extreme" limitations in her abilities to: 1. Carry out complex instructions; 2. Interact

appropriately with the public; 3. Respond appropriately to usual work situations and to

changes in a routine work setting. (R 327-328).  She also opined that Plaintiff had "marked"

limitations in her abilities to: 1. Understand and remember complex instruction; 2. Make

judgments on complex work-related decisions; 3. Interact appropriately with supervisors;

and 4. Interact appropriately with co-workers. (R 327-328).  In addition, she found that

---

[3]At least one source indicates that this abbreviation means "secondary."  *See* Wikipedia *List of medical abbreviations: 0-9.*  https://en.wikipedia.org/wiki/List_of_medical_abbreviations:_0%E2%80%939 (accessed 11/23/20).  Given the context that this abbreviation is used here and in another treatment note, as well as NP Green's other statements in her treatment notes, the Court presumes she uses the abbreviation to mean "secondary to."

[4]It is unclear why NP Green completed this medical source statement a day after she completed the previous medical source statement.

Plaintiff had a "moderate" limitation on her ability to make judgments on simple work-related decisions, and had "mild" limitations on her abilities to: 1. understand and remember simple instructions, and 2. carry out simple instructions. (R 327).  NP Green indicated that Plaintiff "suffers from major depression, post traumatic stress, panic attacks with agoraphobia which impairs her executive functioning in her brain ([decreased] attention/focus/ concentration/memory).  Her symptoms have increased due to harassment on her job which has led to increased anxiety - this interferes with her ability to make decisions & problem solve as well.  She has been filled with self doubt & lack of confidence which has impaired her self esteem/worth."  (R 327).  NP Green also indicated that Plaintiff "has become agoraphobic with increasing anxiety & panic attacks 2° recent /ongoing harassment in her workplace."  (R 328).  In addition, NP Green indicated that Plaintiff "has lost all self confidence/esteem & trust in people since problems with her job/boss forced her to leave due to increased levels of depression & anxiety." (R 328).  In the section of the medical source statement asking to identify the factors that support the assessment, NP Green wrote: "[W]orsening anxiety with panic attacks & agoraphobia.  Decreased functioning @ home & an inability to continue her job which she used to enjoy until feeling harassed by her boss." (R 328).

NP Green completed a third Medical Source Statement of Ability to do Work-Related Activities (Mental) dated January 17, 2018. (R 399-403). Therein she opined that Plaintiff had a "marked" limitations in her abilities to: 1. Understand and remember complex instructions; 2. Carry out complex instructions; 3. Make judgments on complex work-related decisions; 4. Interact appropriately with supervisors; and 5. Interact appropriately with co-workers. (R 399-400).  She also opined that Plaintiff had a "marked to extreme"

limitations in her abilities to: 1. Interact appropriately with the public; and 2. Respond appropriately to usual work situations and to changes in a routine work setting; and had "moderate" limitations in her abilities to: 1. understand and remember simple instructions, and 2. carry out simple instructions. (R 399- 400).  NP Green opined that these limitations were first present as of May 9, 2015, and it was her opinion that Plaintiff's impaired executive functioning was interfering with her cognitive functioning (she had decreased attention, focus, concentration, and memory). (R 399).  NP Green stated that Plaintiff was unable to perform her job from May 9, 2015 through June 8, 2017 due to being incapacitated by severe symptoms of PTSD, panic attacks, and agoraphobia which rendered her homebound.  (R 399).  NP Green also opined that Plaintiff's increased anxiety and panic attacks led to agoraphobia, secondary to work place harassment, and that Plaintiff had a lack of self-confidence with increased self-doubt and a lack of trusting people in general. (R 400).  In the section of the medical source statement asking to identify the factors that support the assessment, NP Green wrote: "Worsening anxiety & panic attacks [caused] agoraphobia that rendered [Plaintiff] homebound & unable/incapacitated to perform her job."  (R 400).

## B.  Dr. James E. Cerio, PhD

NP Green referred Plaintiff to Dr. James E. Cerio, PhD, who treated her for anxiety, depressed mood and PTSD between April 6, 2016 and July 20, 2017.  (R 472-513).  Dr. Cerio completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) dated April 14, 2016. (R 318-320).  Therein, he assessed Plaintiff as having a "marked" limitation in all assessment categories, with the exception of her ability to interact appropriately with the public, in which he found that she had a "moderate" limitation. (R 319-

9

320).  He specifically noted: "While I am just beginning my work with [Plaintiff], my impressions are major depressive disorder, recurrent episode, severe without psychotic features (F33.2), Agoraphobia with panic disorder (F40.01), and post-traumatic stress disorder chronic (F43.12).  These are the factors that are limiting her ability to do the above." (R 318).  He also indicated that there were "other capabilities affected" by Plaintiff's impairments, and explained that Plaintiff "finds it extremely difficult to leave her home."  (R 319).  Plaintiff saw Dr. Cerio thirty-eight times in the fifteen months she treated with him. (R 472-513).

### C.  Dr. Dennis M. Noia, PhD

On February 10, 2016, Plaintiff underwent an independent psychiatric examination conducted by Dr. Dennis M. Noia, PhD, at the request of the Social Security Administration. (R 307-312).  Under psychiatric history, Dr. Noia noted that Plaintiff reported that she had no history of psychiatric hospitalizations, was then in treatment with NP Green, and had been in treatment with several providers off and on since the age of eleven. (R 308). Plaintiff's then current medications were Zoloft, Clonazepam, Wellbutrin, Metoprolol, and magnesium, and Plaintiff stated that she had trouble falling asleep and usually wakes up 2-3 times nightly.  (R 309).  Plaintiff also  admitted to symptoms of depression, anxiety with dysphoric moods, psychomotor retardation, crying spells, feelings of guilt, loss of usual interests, fatigue and loss of energy, diminished self esteem, problems with memory and concentration, diminished sense of pleasure, restlessness, and excessive apprehensiveness and worry. (R 309).

Dr. Noia found on examination that Plaintiff's demeanor and responsiveness to questions were cooperative; her manner of relating, social skills, an overall presentation

were adequate; her personal hygiene and grooming were good; her eye contact was appropriate; her speech intelligibility was fluent; the quality of her voice was clear; and her expressive and receptive language was adequate. (R 309-10).  He also found that Plaintiff's thought processes were coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking; her affect was constricted and "was somewhat reduced in intensity compared to [her] thoughts and speech;" her mood was depressed; and she appeared sad and tearful. (R 310).  Dr. Noia assessed that Plaintiff's sensorium was clear; she was orientated X3; her attention and concentration was intact; and she was able to do counting, simple calculations, and serial 3s.  (R 310).  He also found that Plaintiff's recent and remote memory skills were mildly impaired; her intellectual functioning was estimated to be in the average range; her general fund of information appeared to be appropriate to experience; and her insight and judgment were both good.  (R 310).  Plaintiff reported that she was able to dress, bath, and groom herself but usually did not, and that because of depression she usually did not cook and prepare food, do general cleaning, laundry, shopping, manage money, drive, or use public transportation but rather her family took care of the chores and her husband managed the money.  (R 310).  Plaintiff also reported that socially, she isolated herself from others, and spent her days resting and watching television. (R 310).

In the "Medical Source Statement" portion of Dr. Noia's report he indicates:

Vocationally, the claimant appears to have no limitations in understanding and following simple instructions and directions. She appears to have mild to moderate limitations performing simple tasks. She appears to have mild to moderate limitations performing complex tasks. She appears to have mild limitations maintaining attention and concentration for tasks. She appears to have mild limitations regarding her ability to attend to a routine and maintain a schedule. She appears to have mild limitations regarding her ability to learn

11

new tasks. She appears to have mild limitations regarding her ability to make appropriate decisions. She appears to be able to relate to and interact moderately well with others. There appears to be market limitations regarding her ability to deal with stress.

Difficulties are caused by psychiatric problems.

Results of the examination appeared to be consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis.

(R 310-11).

For his diagnosis, Dr. Noia found "Major Depressive Disorder w/o Psychotic features; Unspecified Anxiety Disorder; RSD.[5]" (R 311).  Dr. Noia recommended that Plaintiff continue "with treatment as currently provided," and indicated that more intensive treatment might be helpful.  (R 311).  He indicated that Plaintiff's prognosis was guarded, "but it is hoped that with continued intervention and support, she will find symptom relief and maximize her abilities." (R 311).  Dr. Noia also indicated that Plaintiff might "need assistance managing money due to psychiatric problems." (R 311).

### D.  Dr. O. Austin-Small, PhD

On February 18, 2016, Dr. O. Austin-Small, PhD, a state agency psychologist, conducted a non-examining consultive examination and provided a Disability Determination Explanation at the initial determination level. (R 78-90).  Dr. Austin-Small reviewed Plaintiff's claim, her medical records, her psychological treatment records from NP Green, the report

---

[5]The Court presumes this is a reference to Reflex Sympathetic Dystrophy, which "is an older term used to describe one form of Complex Regional Pain Syndrome (CRPS). Both RSD and CRPS are chronic conditions characterized by severe burning pain, most often affecting one of the extremities (arms, legs, hands, or feet)."  https://www.health.ny.gov/diseases/chronic/reflex_sympathetic/ (accessed 11/27/20).  The Court reaches this conclusion because in the medical history portion of the report, Dr. Noia notes that Plaintiff was hospitalized in 2011 for bilateral carpal tunnel release and twice for arrhythmia, and states that Plaintiff's chronic medical conditions are "RSD, arrhythmia." (R 309).

12

from Dr. Noia, and Plaintiff's Workers Compensation Board records.  From a mental

functioning standpoint, Dr. Austin-Small determined that Plaintiff had Affective Disorders,

primary, severe, and Anxiety Disorders, secondary, severe.  (R 83).  In assessing the

Listings, Dr. Austin-Small found that medically determinable impairments were present but

did not precisely satisfy the diagnostic "A" criteria.  Under the "B" criteria, Dr. Austin-Small

found that Plaintiff was moderately restricted in activities of daily living, had moderate

difficulties in maintaining social functioning, had moderate difficulties in maintaining

concentration, persistence or pace, and had no repeated episodes of decompensation.

Doctor Austin-Small found that evidence did not establish the presence of the "C" criteria.

(R 83-84)

    For a Mental Residual Functional Capacity Assessment ("MRFCA"), Dr. Austin-Small

found that Plaintiff had sustained concentration and persistence limitations, and was

moderately limited in the abilities to: 1. perform activities within a schedule; 2. maintain

regular attendance, and be punctual within customary tolerances; 3. work in coordination

with or in proximity to others without being distracted by them; 4. complete a normal work

day and work week without interruptions from psychologically based symptoms and to

perform at a consistent pace without an unreasonable manner and length of rest periods; 5.

accept instructions and respond appropriately to criticism from supervisors; 6. get along with

coworkers or peers without distracting them or exhibiting behavioral extremes; 7. respond

appropriately to changes in a work setting; and 8. set realistic goals or make plans

independently of others.  Doctor Austin-Small also found that Plaintiff was not significantly

limited in the other areas addressed by the MRFCA. (R 85-87). After reviewing and

commenting on other data in Plaintiff's file, Dr. Austin-Small ultimately determined that

Plaintiff was "not disabled" within the meaning of the Social Security Act. (R 87-90).

## III.    STANDARD TO DETERMINE DISABILITY

Disability insurance benefits may not be paid unless Plaintiff meets the insured status requirements of 42 U.S.C. § 423(c).  "A disability, as defined by the Social Security Act, is one that renders a person unable to 'engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Ortiz v. Saul*, No. 19-cv-942, 2020 WL 1150213, *5  (S.D.N.Y. Mar. 2020) (quoting 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A)).

> "The impairment must be demonstrated by 'medically acceptable clinical and laboratory diagnostic techniques,'" *Gonzalez v. Astrue*, No. 08-CV-3595, 2012 WL 555305, at *8 (S.D.N.Y. Feb. 21, 2012)(quoting 42 U.S.C. § 423(d)(3)), and the claimant must be "unable to do [her] previous work" [and] unable, given "[her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy." *Shaw v. Chater*, 221 F.3d 126, 131–32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

>> The Commissioner must consider both objective and subjective factors when assessing a disability claim, including: (1) objective medical facts and clinical findings; (2) diagnoses and medical opinions of examining physicians; (3) subjective evidence of pain and disability to which the claimant and family or others testify; and (4) the claimant's educational background, age and work experience.

> *Gonzalez*, 2012 WL 555305, at *8.

*Hill v. Comm'r of Soc. Sec.*, No. 1:19-CV-5096 (ALC), 2020 WL 5768726, at *5 (S.D.N.Y. Sept. 28, 2020).  The regulations set forth a five step sequential analysis for evaluating

whether a person is disabled. 20 C.F.R. § 404.1520.[6]

## IV.   THE ALJ'S DECISION

At step one of the sequential evaluation, the ALJ found that Plaintiff had not performed substantial gainful activity during the period at issue (May 9, 2015 through June 7, 2017). (R 15).  At step two, the ALJ found that Plaintiff had the following severe impairments: carpal tunnel syndrome, reflex sympathetic dystrophy, obesity, and mental impairments (variously characterized). (R 15-16).  At step three, the ALJ found that Plaintiff's impairments did not meet or equal the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R 16-17).  The ALJ then concluded that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with additional environmental and manipulative limitations. (R 17).  The ALJ also assessed a number of mental limitations, and found that Plaintiff can

> perform simple, routine and repetitive tasks.  She can tolerate a low level of work pressure defined as work not requiring multitasking, detailed job tasks, significant independent judgment, a production rate pace, sharing of job tasks or contact with the public. The claimant may work in proximity with others, but the tasks performed should not require working in conjunction with others and

---

[6]In this regard:

At step one, the claimant must demonstrate that [she] is not engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). At step two, the claimant must demonstrate that [she] has a severe impairment or combination of impairments that limits the claimant's ability to perform physical or mental work-related activities. 20 C.F.R. § 404.1520(c). If the impairment meets or medically equals the criteria of a disabling impairment as set forth in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and satisfies the durational requirement, the claimant is entitled to disability benefits. 20 C.F.R. § 404.1520(d). If the impairment does not meet the criteria of a disabling impairment, the Commissioner considers whether the claimant has sufficient [residual functional capacity] for the claimant to return to past relevant work. 20 C.F.R. § 404.1520(e)-(f). If the claimant is unable to return to past relevant work, the burden of proof shifts to the Commissioner to demonstrate that the claimant could perform other jobs which exist in significant numbers in the national economy, based on claimant's age, education and work experience. 20 C.F.R. § 404.1520(g).

*Fancher v. Comm'r of Soc. Sec.*, No. 19-CV-158SR, 2020 WL 5814359, at *2 (W.D.N.Y. Sept. 30, 2020).

should predominantly involve working with objects rather than people.

(R 17).

At step four, the ALJ found that Plaintiff could not have performed any of her past relevant work during the period at issue given this RFC. (R 20-21).  At step five, the ALJ found that Plaintiff was not disabled during this period because she could still have performed other jobs existing in significant numbers in the national economy. (R 21-22).

## V.    STANDARD OF REVIEW

"District courts review a Commissioner's final decision pursuant to 42 U.S.C §§ 405(g) and 1383(c)(3), and 'may only set aside a determination by the Commissioner if it is based on legal error or not supported by substantial evidence in the record.'" *Hill*, 2020 WL 5768726, at *5 (S.D.N.Y. Sept. 28, 2020)(quoting *Cole v. Colvin*, 12-cv-8597, 2014 WL 1224568, at "*2 (S.D.N.Y. Mar. 24, 2014)).  A Commissioner's finding will be deemed conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled.  The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted).  In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Grant v. Colvin*, No. 14-CV-7761, 2016 WL 1092685, at *3 (S.D.N.Y. Mar. 21, 2016)("The Second Circuit has defined substantial evidence as 'more than a mere scintilla, and as such relevant evidence

16

as a reasonable mind might accept as adequate to support a conclusion.'")(quoting *Bushey v. Colvin*, 607 F. App'x 114, 115 (2d Cir. 2015))(citation and internal quotation marks omitted).  Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. *See Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997)(citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).  Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" *Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990)(quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

## VI.    DISCUSSION

### a.  Treating Physician Rule

Plaintiff contends that the ALJ improperly applied the treating physician rule when she gave only "limited weight" to Dr. Cerio's opinion "despite the fact that he was the only psychologist who examined and treated the Plaintiff over the course of fifteen months and thirty eight visits."  Pl. Br., at 17-19.  She argues that "[t]he ALJ's failure to properly apply the treating physician rule requires reversal." *Id.* at 19.  The Court agrees.

"The Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R. § 404.1527(c)." *Chad B. v. Saul*, No. 3:19-CV-814 (DJS), 2020 WL 5751170, at *3 (N.D.N.Y. Sept. 25, 2020).  "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the

appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019).  "Because Plaintiff's claim was filed before March 27, 2017, these procedures include the treating physician rule." *Christopher B. v. Saul*, No. 8:19-CV-00905 (BKS), 2020 WL 5587266, at *12 (N.D.N.Y. Sept. 18, 2020)(citing 20 C.F.R. § 404.1527(a)(2))(footnote omitted).  Applying the treating physician rule is a two step process.

"First, the ALJ must decide whether the opinion is entitled to controlling weight. '[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Estrella*, 925 F.3d at 95 (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).  "'[M]edically acceptable clinical and laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'" *Christopher B.*, 2020 WL 5587266, at *13 (quoting *Burgess*, 537 F.3d at 128)(additional quotation marks and citation omitted).  "'Deference to such medical providers is appropriate' because treating physicians 'are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairments' and 'may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations.'" *Id.* (quoting *Barthelemy v. Saul*, No. 18-cv-12236, 2019 WL 5955415, at *8, 2019 U.S. Dist. LEXIS 196749, at *22 (S.D.N.Y. Nov. 13, 2019))(additional quotation marks and citation omitted).

18

"Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, it must 'explicitly consider' the following, nonexclusive '*Burgess* factors': '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Estrella*, 925 F.3d at 95–96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (*per curiam*)(in turn citing *Burgess*, 537 F.3d at 129)). "At both steps, the ALJ must 'give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.'" *Id.* at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)(*per curiam*)).

"An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Id.* (citing *Selian*, 708 F.3d at 419–20). "If 'the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment],' we are unable to conclude that the error was harmless and consequently remand for the ALJ to 'comprehensively set forth [its] reasons.'" *Id.* (quoting *Halloran*, 362 F.3d at 33). "If, however, 'a searching review of the record' assures us 'that the substance of the treating physician rule was not traversed,' we will affirm." *Id.* (quoting *Halloran*, 362 F.3d at 32)(brackets added).

Here, the ALJ noted at step two of the sequential evaluation that Plaintiff had received mental health treatment from Dr. Cerio "since April 2016" (R 15), but did not address Dr. Cerio's opinion until discussing the RFC. There, the ALJ wrote:

> I have given limited weight to an opinion provided by James Cerio, Ph.D., the claimant's treating psychologist, because he acknowledged that he only

19

> started treating the claimant at the time he rendered the opinion (Exhibits B6F, B7F).  In addition, the "marked" limitations Dr. Cerio identified are contradicted by treatment notes from his office, which  indicated improvement in the claimant's symptoms with treatment (Exhibit B24F, pages 7, 9).

(R 18).

Assuming *arguendo* that the determination to afford Dr. Cerio's opinion less-than-controlling weight is consistent with other substantial evidence in the case record, the Court proceeds to the second *Estrella* step.  When doing so, it is clear that the ALJ's decision to apply only limited weight to Dr. Cerio's opinion fails to explicitly articulate consideration of the first and third *Burgess* factors.  While the ALJ indicated that Plaintiff had received mental health treatment from Dr. Cerio since April 2016, merely acknowledging the treatment relationship "is not the same as explicitly considering the frequency, length, nature, and extent of treatment." *Ferraro v. Saul*, 806 Fed. Appx. 13, 15 (2d Cir. 2020).  The Court in *Ferraro* found that "[t]his is particularly true where, as here, the relationships involved dozens of appointments over nearly two years, and the doctors worked continuously with the patient to develop and monitor the success of various treatment plans." *Id.*  The ALJ's decision does not explicitly address the frequency, nature, and extent of Dr. Cerio's treatment.  Further, the ALJ did not explicitly consider the consistency of Dr. Cerio's opinion with the remaining medical evidence.  Thus, the ALJ committed procedural error.

Having made this finding, the Court must conduct "a searching review of the record" to assure itself that the substance of the treating physician rule "was not traversed —*i.e.*, whether the record otherwise provides 'good reasons' for assigning [limited weight] to [Dr. Cerio's] opinion." *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).  For the

reasons that follow, the Court is not assured that the treating physician rule was not traversed.

While the ALJ may have had good reasons to minimize Dr. Cerio's opinion based only on his initial evaluation of Plaintiff, the ALJ addressed Dr. Cerio's opinion and assessed the weight to afford it in the context of Plaintiff's treatment with Dr. Cerio over thirty-six sessions.[7] This is evident by the above-quoted passage in which the ALJ references two of Dr. Cerio's treatment notes in support of the decision to provide less-than-controlling weight, and by other references to Dr. Cerio's treatment notes the ALJ considered to reach the RFC (discussed more fully below). The ALJ's decision to afford Dr. Cerio's opinion limited weight based on two treatment notes showing improvement in Plaintiff's symptoms is not, in itself, a good reason for the weight assigned to Dr. Cerio's opinion on the nature and severity of Plaintiff's impairments. Although Dr. Cerio's treatment notes indicate that Plaintiff ultimately improved to the point she could return to work, these notes reflect cycles of improvement and digression over the course of treatment. For example, as late as April 6, 2017, Dr. Cerio assessed that Plaintiff's "[Mental State Exam ("MSE")] is unchanged. Anxiety is high. Depressed mood continues to be present. She cried throughout this visit. She felt panic. She had the physical symptoms of anxiety." (R 508). The ALJ's selective focus on two of Dr. Cerio's treatment notes which, taken in isolation, suggest that Plaintiff's symptoms were improving, fails to account for Dr. Cerio's treatment as a whole which suggests that Plaintiff's impairment was significant during much of the closed period in issue here. This fails to provide good reasons to dispense with the treating physician rule. *See, e.g., Chad*

---

[7]As noted above, Plaintiff met with Dr. Cerio thirty-eight times, and the record reflects that all but two of these meetings occurring during the closed period in issue here.

*B.*, 2020 WL 5751170, at *4 ("Isolating this one fact without discussing other evidence in the record which is more consistent with Dr. Bennett's opinion constituted impermissible cherry-picking.")(citing *Luke H. v. Saul*, 2020 WL 4346789, at *3 (N.D.N.Y. July 28, 2020)).

The ALJ also references other of Dr. Cerio's treatment notes in reaching the RFC.  In this regard, the ALJ states that Plaintiff "periodically presented with changes in mood or affect that were consistent with the presence of a medically determinable impairment, but repeat mental status exams were otherwise unremarkable that did not support finding greater mental limitations than outlined above."  (R 19-20).  In support of this conclusion the ALJ cites to, *inter alia*,[8] Dr. Cerio's initial evaluation where he "noted that the claimant appeared upset and scared [yet] she was appropriately dressed and cooperative, and had no homicidal ideation, delusions, or hallucinations," and found that Plaintiff's "memory, orientation, intelligence, and judgment appeared to be within normal limits." (R 20).  Despite the ALJ's conclusion that Plaintiff's mental status exam at Dr. Cerio's initial evaluation was "otherwise unremarkable" and did not support finding greater mental limitations than set forth in the RFC determination, the record indicates that the examination at the initial meeting revealed that the Plaintiff had been sexually abused as a child and grew up in a home of alcoholic and drug abusing parents.  These facts were later incorporated by Dr. Cerio in concluding that Plaintiff suffered with PTSD that was triggered by her male

---

[8]The ALJ also cites to three treatment notes from NP Green, writing: (1) "[O]n September 8, 2015, Ms. Green noted that the claimant was sad with insecure mood and tearful and crying affect; yet, the remainder of her mental status evaluation was normal;" (2) "During another evaluation, Ms. Green indicated that the claimant was depressed and tearful, but her appearance was appropriate, memory was intact, orientation was intact, insight and judgment were good, thought content was clear and coherent, and thought process was logical and rational;" and (3) "On September 8, 2016, Ms. Green noted that the claimant's mood was euthymic, affect was even, and no suicidal/homicidal ideations or auditory or visual hallucinations were present."  (R 20).

supervisor.   Further, Dr. Cerio assessed as part of the mental status exam at the initial

evaluation that Plaintiff's "anxiety has been present throughout life and more recently has

taken on agoraphobic and panic symptoms.  PTSD appears to be chronic and stems from

trauma in the home as a child, sexual abuse at age 11, and problems with two supervisors

at work. Work has been frightening for her and she has been avoiding making a decision

about it." (R 474).  This information and Dr. Cerio's mental status assessment does not

provide good reasons to provide diminished weight to Dr. Cerio's opinion because it does

not take into account the longitudinal picture of Plaintiff's mental impairments as reflected in

Dr. Cerio's treatment notes as a whole.  *See Chad B.*, 2020 WL 5751170, at *4; *see also*

*Dorsey v. Saul*, No. 3:18-CV-01964(VLB), 2020 WL 1307107, at *7 (D. Conn. Mar. 19,

2020)("The premise behind weighing the length and frequency of the treating relationship is

that a treating source will have obtained a longitudinal picture of the claimant's impairment

with enough visits over a long enough period of time.")(citing 416 C.F.R. 927(c)(2)).

    The ALJ also cites to five of Dr. Cerio's treatment notes for the proposition that

Plaintiff's psychological symptoms improved with treatment, (R 20),[9] and to four of his

treatment notes that show that Plaintiff engaged in activities that contradicted Plaintiff's

---

[9]In this regard, the ALJ writes:

The claimant's psychological symptoms improved with treatment. For instance, on August
25, 2016, the claimant stated that she was doing better (Exhibit B24F, page 17). Dr. Cerio
noted that the claimant's insight was growing (Exhibit B24F,  page 23).  On January 12,
2017, Dr. Cerio noted a clear improvement in the claimant's mental status evaluation as she
appeared less depressed, less anxious, and more excited (Exhibit B24F,  page 31).  During
another evaluation, Dr. Cerio indicated that the claimant's mood had improved (Exhibit
B24F,  page  32).  She reported to improvement in her confidence (Exhibit B24F, page 35).
Ms. Green noted that the claimant was "feeling better as things got done" (Exhibit B20F,
page 3).

(R 20).

23

"claim that she is as socially isolated as alleged at the hearing." (R 20).[10]  As indicated

above, Plaintiff's symptoms from her mental impairments deviated over the course of the

closed period in issue here and, seemingly consistent with this deviating cycle, Plaintiff's

ability to attend outside functions also deviated.  While the Court does not hold that the ALJ

could not assess Plaintiff's outside activities as a factor in assessing the RFC, the identified

outside activities appear to be isolated snapshots of Plaintiff's abilities that do not by

themselves provide good reasons to assign Dr. Cerio's opinion diminished weight.  For

instance, while Dr. Cerio's May 19, 2016 treatment note indicates that Plaintiff had made

progress by going to Walmart for the first time in a year and by going to her grandmother's

house so that her son's prom photos could be taken there, (R 479), the next progress note

on May 26, 2016 indicates that "some improvement occurred in the past week, although

there is a renewed sense of helplessness again." (R 480).   In the December 22, 2016

treatment note where Plaintiff indicated that she had attended one of her son's hockey

games, Dr. Cerio assessed that her "MSE is unchanged, and while she continues to cry

during her visit here, she is making progress." (R 500).  In the treatment note where Plaintiff

indicated that she "pushed herself to go to the boys' games and to go to the movies with

one of her boys," she also stated that she was ashamed and embarrassed because she

cannot do things that were once a part of her life and that she was ashamed that she was

---

[10]In this regard, the ALJ writes:

In addition, the claimant was able to attend her son's hockey games (Exhibit B24F, page 29), used Facebook (Exhibit B24F, page 24), went to her grandmother's house (Exhibit B24F, page 8), shopped at Wal-Mart (Exhibit B24F, page 8), and attended movies (Exhibit B24F, page 25). These activity levels contradict her claim that she is as socially isolated as alleged at the hearing.

(R 20).

24

not working.  Dr. Cerio assessed her at this visit as "more depressed today.  She cried

throughout the visit."  (R 496).  Without elaboration on the longitudinal picture of Plaintiff's

impairments and the overall course of treatment with Dr. Cerio, the ALJ's reference to

Plaintiff's periodically changing mood, affect, and ability to engage in outside activities fails

to address "the apparent longitudinal inconsistencies in [Plaintiff's] mental health—one of

the motivations behind *Burgess*'s procedural requirement of explicit consideration of 'the

frequen[cy], length, nature, and extent of [a physician's] treatment.'" *Estrella*, 925 F.3d at 97

(quoting *Selian*, 708 F.3d at 418–19).  "This failure is especially relevant here because the

first *Burgess* factor, and therefore evidence supporting its satisfaction, is of heightened

importance in the context" of a claim that includes a mental health impairment such as

depression.  *Id.*  "'Cycles of improvement and debilitating symptoms [of mental illness] are a

common occurrence, and in such circumstances it is error for an ALJ to pick out a few

isolated instances of improvement over a period of months or years and to treat them as a

basis for concluding a claimant is capable of working.'" *Id.* (quoting *Garrison v. Colvin*, 759

F.3d 995, 1017 (9th Cir. 2014) and citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir.

2008)("A person who has a chronic disease, whether physical or psychiatric, and is under

continuous treatment for it with heavy drugs, is likely to have better days and worse days ....

Suppose that half the time she is well enough that she could work, and half the time she is

not. Then she could not hold down a full-time job.")).  When viewed in the context of

Plaintiff's extensive treatment by Dr. Cerio, especially with the evidence of the cyclical

nature of the symptoms of Plaintiff's mental impairments, the ALJ's reference to isolated

treatment notes provides an insufficient basis to provide Dr. Cerio's opinion less-than-

controlling weight.  *See id.* ("When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide - 'good reasons' for minimalizing Dr. Dron's opinion.").  "While it is undoubtedly true that an ALJ does not have to state on the record every reason justifying a decision, and is not required to discuss every piece of evidence submitted, an ALJ also may not cherry-pick out of the record those aspects of the physicians' reports that favor [her] preferred conclusion and ignore all unfavorable aspects' without explaining [her] choices.  Nor may an ALJ substitute their own expertise or view of the medical proof for the treating physician's opinion." *Christopher B.*, 2020 WL 5587266, at *16 (internal quotation marks, citations, and brackets omitted); *see also Chad B.*, 2020 WL 5751170, at *4.  An ALJ is entitled to give less-than-controlling weight to a treating physician's opinion that is inconsistent with his own treatment notes, *see Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013)(ALJ may discount a medical source statement where it "conflict[s] with [the doctor's] own treatment notes"), but, for the reasons discussed above, the cited treatment notes are not necessarily inconsistent with Dr. Cerio's opinion and therefore do not provide good reasons to discount Dr. Cerio's opinion. *See, e.g., Christopher B.*  2020 WL 5587266, at *16 ("Here, where the ALJ discounted the opinions of Plaintiff's treating physician as inconsistent with his own view of what the longitudinal treatment record showed, while selectively focusing on evidence that he felt supported this view and failing to address substantial evidence that appears to corroborate the treating physician's views, the Court cannot find that the ALJ expressed 'good reasons' for dispensing with the treating physician rule.").

Further, the other opinions in the record do not necessarily provide good reasons to

26

assign Dr. Cerio's opinion less-than-controlling weight.  In addressing the RFC, the ALJ

cites to three treatment notes from NP Green for the proposition that Plaintiff "periodically

presented with changes in mood or affect that were consistent with the presence of a

medically determinable impairment, but repeat mental status exams were otherwise

unremarkable that did not support finding greater mental limitations than outlined above."

(R 19-20).  NP Green's three treatment notes do not necessarily support this proposition,[11]

and do not, by themselves, provide good reasons to discount Dr. Cerio's opinion.  Further,

NP Green's treatment notes as a whole during the closed period, and her three medical

source opinions, support Dr. Cerio's opinion and do not provide "good reasons" to discount

Dr. Cerio's opinion.   While the ALJ cited to specific portions of NP Green's treatment notes

that the ALJ felt showed normal mental status exams, these snapshots from NP Green's

treatment notes do not reflect the full extent of NP Green's treatment of Plaintiff or the

nature and severity of Plaintiff's symptoms which appear to have digressed to the point that

NP Green referred Plaintiff to Dr. Cerio and considered counseling Plaintiff on short-term

hospitalization if additional therapy could not be obtained.  Further, while the ALJ was

---

[11]For instance, the September 8, 2015 note indicates that NP Green conducted the session by Skype (perhaps indicating that Plaintiff was unable to drive to the appointment); assessed Plaintiff's mood as insecure, her self doubt as increased, her energy/motivation as decreased; and noted that Plaintiff stated she felt emotionally and physically tired.  Further, the note indicates that NP Green's plan was to start Plaintiff on the generic drug bupropion while continuing her on Zoloft and Clonazepam. (R 257).  This medical note does not necessarily contradict Dr. Cerio's opinion that Plaintiff had marked limitations in all areas other than her ability to interact appropriately with the public, and the ALJ does not address how a medical plan to start a patient on an antidepressant medication is consistent with an unremarkable mental status exam supporting a return to work even with the limitations provided in the RFC.  Likewise, the ALJ's reference to an evaluation by NP Green where the ALJ stated that the record indicated that "the claimant was depressed and tearful, but her appearance was appropriate, memory was intact, orientation intact, insight and judgment were good, thought content was clear and coherent, and thought process was logical and rational," also indicates that Plaintiff stated that she was "still tired, feel[s] down & low energy all the time," and NP Green's plan also included starting bupropion. (R. 258).  With regard to NP Green's September 8, 2016 treatment note, the note indicates that Plaintiff had seen Dr. Cerio that day to address an issue related to Plaintiff's history of childhood sexual abuse, and that NP Green continued Plaintiff on bupropion, Zoloft, and Clonazepam. (R 395).

entitled to afford partial weight to NP Green's July 6, 2016 medical source statement because it showed greater limitations than her medical source statement a day earlier with no apparent reason for the change, in NP Green's January 17, 2018 medical source statement she opined that Plaintiff was unable to perform her job from May 9, 2015 through June 8, 2017 due to being incapacitated by severe symptoms of PTSD, panic attacks, and agoraphobia which rendered her homebound.  NP Green also opined that Plaintiff's increased anxiety and panic attacks led to agoraphobia, secondary to work place harassment, and that Plaintiff had a lack of self-confidence with increased self-doubt and a lack of trusting people in general.  While this opinion was drafted after the closed period in issue ended, NP Green offered an opinion regarding Plaintiff's symptoms during the closed period, a portion of which Plaintiff was under NP Green's care.[12]  NP Green's January 17, 2018 medical source statement, and her treatment notes during the closed period, do not provide good reasons for discounting the weight afforded Dr. Cerio's opinion, but rather supports it.  On remand, if the ALJ assigns less-than-controlling weight to Dr. Cerio's opinion, she should discuss the impact of NP Green's January 17, 2018 medical source statement on that opinion.

Dr. Noia's "Medical Source Statement" also does not necessarily provide "good reasons" to discount Dr. Cerio's opinion.  While Dr. Noia concluded that Plaintiff had no limitations in understanding and following simple instructions and directions, mild limitations

---

[12]The ALJ stated that she "assigned limited weight to the medical opinions provided before and after the time period under review, because these restrictions have limited probative value as to the claimant's functioning during the requested closed period, and these opinions were rendered during a time period that the claimant was either engaging in work activity at levels indicative of substantial gainful activity or previously found disabled," referencing, *inter alia*, NP Green's January 17, 2018 medical source statement. (R 19). Other than this reference, the ALJ's decision does not mention the opinions contained in NP Green's January 17, 2018 medical source statement.

in other areas, mild to moderate limitations in certain areas, and the ability to relate to and interact moderately well with others, he also concluded that Plaintiff had marked limitations regarding her ability to deal with stress and that she appeared to have psychiatric problems that "may significantly interfere with [her] ability to function on a daily basis." (R 310-11).   As the ALJ concluded at step two of the sequential evaluation:

> During any given encounter, mental health professionals have given the claimant  various diagnoses and characterized her mental impairment in various ways (posttraumatic stress disorder, depression, anxiety, agoraphobia with panic disorder). In determining whether an individual is disabled, what the impairment is called is of no real consequence; rather how a given impairment affects mental functioning is the central inquiry under the Act. By finding the claimant to have a "severe" mental impairment however characterized, all symptoms affecting her mental functioning have been considered.  It is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.

(R 16).

Dr. Noia's conclusion that Plaintiff had marked limitations in dealing with stress and psychiatric problems that "may significantly interfere with [her] ability to function on a daily basis" appears to indicate that Plaintiff's mental impairments significantly impacted her ability to perform basic work functions even with the RFC's limitations.  This raises a question whether Dr. Noia's assessment gives good reasons for assigning limited weight to Dr. Cerio's opinion.  Further, although the ALJ indicated that Dr. Noia's opinion appeared to be an "underestimate of the claimant's functional limitations given the documented difficulties she had with social interaction," (R 18 citing page 3 of Dr. Cerio's treatment notes), the ALJ assigned Dr. Noia's opinion "partial evidentiary weight" "because he had the opportunity to examine the claimant once, and his opinion does not preclude the mental abilities outlined above." (R 18).  The Second Circuit has "frequently 'cautioned that ALJs

should not rely heavily on the findings of consultative physicians after a single examination.'" *Estrella*, 925 F.3d at 98 (quoting *Selian*, 708 F.3d at 419). "This concern is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of her longitudinal mental health," *id.,* and especially concerning here because Dr. Noia evaluated Plaintiff on February 10, 2016, which was before NP Green assessed that Plaintiff's mental status had deteriorated to the point that NP Green recommended additional counseling from Dr. Cerio and possibly in-patient treatment until additional counseling could be obtained. Given these issues, Dr. Noia's opinion does not necessarily provide good reasons to discount Dr. Cerio's opinion. On remand, the ALJ should further elaborate on whether Dr. Noia's opinion provides good reason to discount Dr. Cerio's opinion.

The same conclusion is reached as to Dr. Austin-Small's opinion. The ALJ noted that Dr. Austin-Small's opinion, like Dr. Noia's, appeared to be an underestimate of Plaintiff's functional limitations in light of Plaintiff's documented difficulties with social interaction (R 18, citing to page 3 of Dr. Cerio's treatment notes). The ALJ assigned "limited weight" to Dr. Austin-Small's opinion "because she did not have the opportunity to examine the claimant." (R 18). Although the ALJ references a page from Dr. Cerio's treatment notes in assigning Dr. Austin-Small's opinion limited weight, Dr. Austin-Small's opinion was issued before Plaintiff began treatment with Dr. Cerio. On this record, and without Dr. Austin-Small reviewing Dr. Cerio's treatment notes that were the result of treatment subsequent to Dr. Austin-Small's opinion, a significant question exists whether Dr. Austin-Small's opinion provides good reasons to discount Dr. Cerio's opinion especially in light of the cyclical nature of Plaintiff's mental health symptoms. If the ALJ finds on remand that Dr.

Austin-Small's opinion provides good reasons to afford Dr. Cerio's opinion less-than-controlling weight, then she should elaborate on this issue.

For these reasons, the Court concludes that the record as a whole does not provide "good reasons" for assigning "limited weight" to Dr. Cerio's opinion.  Accordingly, the Court concludes that the ALJ erred in failing to properly apply the treating physician rule to Dr. Cerio's opinion.  Further, the Court finds that this error is not harmless because Dr. Cerio's opinion, if accepted as controlling, could change the  ALJ's conclusion on whether Plaintiff had a impairment meeting Listing level severity or whether Plaintiff's RFC was such that she would be unable to perform any of the available jobs identified by the vocational expert. *See, e.g., Price v. Comm'r of Social Security*, No. 14-CV-9164, 2016 WL 1271501, at *4 (S.D.N.Y. Mar. 31, 2016)("An error in application of the treating physician rule is harmless if 'application of the correct legal standard could lead to only one conclusion.'")(quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).  Therefore, the Court remands the matter for the ALJ to properly apply the treating physician rule to Dr. Cerio's opinion.

**b. Listings**

Plaintiff contends that the Commissioner incorrectly concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  (Dkt. No. 7, at 13-14).  In making this argument, Plaintiff notes that "[n]owhere does [the ALJ] give any consideration to the opinions or records of Plaintiff's primary treating physician[] Dr. Cerio or her longtime therapist Kathy Green." (Dkt. No. 7, at 14).  Because the matter is remanded for the ALJ to properly apply the treating physician rule to Dr. Cerio's opinion which could result in the ALJ applying more weight to

Dr. Cerio's opinion than Dr. Noia's opinion, the Court will refrain from addressing this issue at this time.  After the ALJ applies the treating physician rule to Dr. Cerio's opinion, she should reassess whether Plaintiff had an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.

### c. Plaintiff's Credibility

Plaintiff also challenges the ALJ's denial of his benefits on the ground that she failed to make adequate findings regarding Plaintiff's credibility. (Dkt. No. 7, at 21-22).  "Given the ALJ's failure to properly apply the treating physician rule, [her] evaluation of Plaintiff's subjective symptoms is 'necessarily flawed' because '[t]he ALJ's proper evaluation of [the treating physician's] opinion[] will necessarily impact the ALJ's credibility analysis.'" *Christopher B.*, 2020 WL 5587266, at *19  (quoting *Mortise v. Astrue*, 713 F. Supp. 2d 111, 124-25 (N.D.N.Y. 2010) and citing *Rivera-Cruz v. Berryhill*, No. 16-cv-2060, 2018 WL 4693953, at *8, 2018 U.S. Dist. LEXIS 168606, at *19 (D. Conn. Sept. 30, 2018) (finding that remand was warranted on the issue of the ALJ's credibility determination because the ALJ had failed to properly apply the treating physician rule)).  "Because the Court remands to the ALJ with instructions to reassess the weight of [Dr. Cerio's opinion] in light of the treating physician rule, on remand, the ALJ must also reconsider the credibility determination in light of any revisions [she] makes to the weight accorded to [Dr. Cerio's opinion]." *Id.* (internal quotation marks and citation omitted).   In doing so, "the ALJ should also consider Plaintiff's work history when making her credibility assessment." *Giambrone v. Colvin*, No. 15-CV-05882 (PKC), 2017 WL 1194650, at *21 (E.D.N.Y. Apr. 3, 2017)(citing *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)("A plaintiff with a good work history is

entitled to substantial credibility when claiming inability to work."); *Fernandez v. Astrue*, No. 11-CV-3896 DLI, 2013 WL 1291284, at *20 (E.D.N.Y. Mar. 28, 2013)(finding the plaintiff was entitled to substantial credibility based on a 25–year work history)); *see also Milien v. Astrue*, 2010 WL 5232978, at *10 (E.D.N.Y. Dec.16, 2010) (finding error where the ALJ failed to consider plaintiff "left her long-standing place of employment only when her symptoms took a dramatic turn for the worse").

### d. Substitution of ALJ's Judgment for Medical Conclusions

Plaintiff argues that the ALJ substituted her own judgment for the medical conclusion that Plaintiff's mental status exams were "otherwise unremarkable" such that they did not support greater mental limitations than set forth in the RFC.  The Commissioner argues that the ALJ did not substitute her own judgment but rather identified conflicting medical opinions and merely resolved an evidentiary conflict.  Because the Court remands this case for the ALJ to properly apply the treating physician rule to Dr. Cerio's opinion, which could change the ALJ's determination in this regard, the Court will refrain from addressing this issue.

### e. Remaining Arguments

Likewise, as the Court has determined that remand is required, the Court does not reach Plaintiff's remaining arguments that the Commissioner's findings are not supported by substantial evidence and that the Commissioner failed to properly assess Plaintiff's RFC. (Dkt. No. 7, at 12-13, 22-24).

### VII.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **REVERSED**,

33

and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C.

§ 405(g) for further proceedings consistent with this Decision and Order.

The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: November 24, 2020

Thomas J. McAvoy
Senior, U.S. District Judge